## STATE OF CONNECTICUT *v.* JASON MANN
## (AC 27779)

Gruendel, Beach and Alvord, Js.

Argued October 21, 2009—officially released March 2, 2010

*Neal Cone*, senior assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Kevin D. Lawlor*, state's attorney, and *Marjorie L. Sozanski*, assistant state's attorney, for the appellee (state).

### Opinion

GRUENDEL, J. The defendant, Jason Mann, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3). On appeal, the defendant challenges as improper the trial court's instructions to the jury concerning (1) his consciousness of guilt and (2) his interest in the outcome of the case when assessing his credibility, which he alleges violated both his federal and state constitutional rights. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 2:15 a.m. on October 18, 2004, the defendant entered a Mobil gasoline station (Mobil station) and convenience store in Derby. Mohammed Khan, the cashier working that morning, recognized the defendant as an occasional customer. Indeed, the defendant occasionally purchased from that Mobil station soda, cigarettes and gasoline for his green 1985 Chevrolet C20 truck (green truck). When the defendant entered the store that morning, he exchanged pleasantries with Khan, and the two engaged in small talk. As Khan entered the cashier's booth, the defendant approached him from behind, brandished a silver folding knife and ordered Khan to open the cash register. Fearing for his safety, Khan complied, and the defendant removed most of the money, put it in his left jacket pocket and fled. Once the defendant was gone, Khan ran outside, used a telephone from a man in the parking lot and called the police, who responded shortly thereafter. Khan informed the police that he recognized the defendant as an occasional customer. He described the defendant as a "white male, approximately five foot eight . . . wearing a black jacket, underneath was a hooded gray sweatshirt, the hood was up over his head, but his face was visible, blue pants and described as having a . . . three to four day [beard] on his face."

Another officer patrolling the area that morning searched for the defendant upon notification over the police radio of the defendant's description. Approximately two blocks from the Mobil station, the officer observed an unshaven white male wearing a blue sweat suit, whom he approached and stopped because he partially matched the defendant's description. Unbeknownst to the officer, that individual was, in fact, the defendant. The officer asked the defendant if he had recently been on Pershing Drive, where the Mobil station was located, to which the defendant responded

in the negative. The defendant explained that he was returning from his friend's house in Ansonia and that his friend was named "Black." Despite alleging to have been returning from Black's house, the defendant informed the officer that he neither knew Black's address nor Black's first name.[1] The defendant claimed that while returning from Black's house, his green Infiniti automobile (green car) had run out of gasoline and that he was walking along the street in search of a gasoline station. The officer provided the defendant with directions to the two nearest gasoline stations open at that hour—the Mobil station and a Cumberland Farms store located across the street from the Mobil station.

As the defendant began to walk in the direction of the gasoline stations, the officer observed him enter Griffin Hospital, stand in the main entrance for approximately thirty seconds and then leave. Upon exiting the hospital, the defendant proceeded in the direction opposite the gasoline stations. The officer again approached the defendant and asked whether he understood the directions. The defendant responded to that query in the affirmative and indicated that he had entered the hospital to call a friend for a ride to a gasoline station, even though the stations were approximately only two blocks away. He further indicated that he was unable to procure a ride, at which time the officer offered to drive the defendant to a gasoline station. The defendant accepted, and they proceeded to the Mobil station, which the defendant had just robbed. Upon their arrival, another officer already at the Mobil station instructed Khan to take a look at the defendant, seated in the rear of the police cruiser. Khan identified the defendant as the robber, and the defendant was placed under arrest.

---

[1] At trial, the defendant testified that his friend's full name is Titus Black. He claimed that he was unable to recall Black's first name when speaking with the officer but still maintained that he did not know Black's address.

Police searched the defendant and discovered $17 in cash in his front left pocket.

After being placed under arrest, the defendant proclaimed his innocence and told the officers that he could direct them to the location of the green car to show them that it had, in fact, run out of gasoline. The police obliged and, before returning with the defendant to police headquarters, they drove to the location where the defendant claimed the green car was located. Unable to find the green car, an officer telephoned the defendant's home and spoke with Michael Mann, the defendant's brother, who informed him that their mother drives the green car. Mann also told the officer that his brother, the defendant, drives the green truck. The officer relayed that information to the Ansonia police department and, moments later, as the officers were en route to police headquarters with the defendant, they were notified that the green truck had been located nearby. They proceeded to that location, where they observed the truck with the keys in the ignition, a crumpled up dollar bill on the floor under the steering wheel, and a black jacket and gray sweatshirt between the driver's seat and door. The officers removed those items and discovered $100 in cash in the left front jacket pocket. They also discovered a silver folding knife in the jacket. All of those items were transported to police headquarters, where they were processed and stored. Thereafter, a jury trial followed, at the conclusion of which the jury found the defendant guilty of robbery in the first degree, and the court rendered judgment accordingly. From that decision, the defendant appeals.

I

The defendant first claims that the court's consciousness of guilt instruction was improper. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. The court

instructed the jury on consciousness of guilt in pertinent part: "It is up to you as judges of the facts to decide whether the conduct of the defendant reflects a consciousness of guilt and to consider such in your deliberations in conformity with the instructions.

"False statements made by a defendant are circumstantial evidence from which the jury may, but is not required to, infer a guilty consciousness.

"In this case, you have heard evidence of statements made by the defendant after the time of the alleged offense, where the defendant when questioned by the Derby police on October 18, made statements that he had been driving a green [car] that ran out of gas on Olson Drive in Ansonia.

"First, you must determine whether the state has proven such statement and, if so, that such statement was false. You must then find proven that the defendant made such statement in connection with the crime. Any false statement, if proven false, tends to show a consciousness of guilt. It does not, however, raise a presumption of guilt.

"It is up to you as judges of the facts to decide whether any statement or conduct of the defendant reflects consciousness of guilt and to consider such in your deliberations in conformity with these instructions."

In its concluding instruction, the court stated: "Please remember that when I pointed out certain evidence during the course of these instructions, that was only to illustrate how you might go about relating the evidence you have heard to these instructions on the law. You should not confine your deliberations to the evidence that I mentioned; rather, you should consider all of the evidence, and it is your own recollection of the evidence that controls. Furthermore, the fact that I may have mentioned certain evidence does not imply that I

have any opinion, one way or the other, what your verdict should be." At the conclusion of the court's charge, the defendant took exception to the court's reference to his statement about the green car, preserving his claim for our review. Cf. *Mauro* v. *Yale-New Haven Hospital*, 31 Conn. App. 584, 591, 627 A.2d 443 (1993).

On appeal, the defendant argues that the court's reference to the green car in its instruction was improper. Specifically, the defendant contends that a court's "[i]nstructions should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over portions of the testimony on the other side which deserve equal attention." *State* v. *Rome*, 64 Conn. 329, 339, 30 A. 57 (1894). Essentially, the defendant claims that the instruction was improper because it was not evenhanded with respect to possible innocent explanations concerning his statement about the green car.[2]

In reviewing claims of instructional error, we are guided by the well settled standard that "[a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The test to be applied is whether, when read as a whole, the charge presents the case to the jury in such a way that no injustice will result." (Citation omitted; internal quotation marks omitted.) *State* v. *Mastropetre*, 175 Conn. 512, 524, 400 A.2d 276 (1978).

In considering consciousness of guilt instructions, our Supreme Court has observed: "Generally speaking,

---

[2] In particular, the defendant calls attention to his testimony that his statement to the officer allegedly indicated that he drove the green car the day before the robbery.

all that is required is that the evidence have relevance, and the fact that ambiguities or explanations may exist which tend to rebut an inference of guilt does not render evidence . . . inadmissible but simply constitutes a factor for the jury's consideration. . . . The fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make an instruction . . . erroneous. . . . Moreover, [t]he court was not required to enumerate all the possible innocent explanations offered by the defendant." (Internal quotation marks omitted.) *State* v. *Figueroa*, 257 Conn. 192, 196, 777 A.2d 587 (2001); *State* v. *Groomes*, 232 Conn. 455, 472–73, 656 A.2d 646 (1995); *State* v. *Freeney*, 228 Conn. 582, 593–94, 637 A.2d 1088 (1994).

Based on our review of the court's charge in its entirety, we are convinced that no injustice resulted from the court's reference to the green car in its consciousness of guilt instruction. The court reminded the jury that it was the sole finder of fact, that it should rely on its own recollection of the evidence to determine the facts, that it should not confine its deliberation to the evidence mentioned by the court and that it should disregard any opinion allegedly suggested by the court concerning the facts. When read as a whole, the court's instruction properly informed the jurors that the defendant's consciousness of guilt was a permissive inference that the jury could draw from his statement concerning the green car. Moreover, the court was under no obligation to instruct the jury on possible innocent explanations offered by the defendant. Accordingly, we conclude that the court's instruction was proper.

II

The defendant next claims that the court's instructions unduly emphasized his interest in the outcome of

the case, thereby undermining both his federal and state constitutional rights. We disagree.

The following additional facts are relevant for our consideration of the defendant's claim. In its charge to the jury, the court instructed as follows: "In deciding what the facts are, you must consider all the evidence. In doing this, you must decide which testimony to believe and which testimony not to believe. You may believe all, none or a part of any witness' testimony. That is up to you. In making that decision, you may take into account a number of factors, including the following: . . . Did the witness have an interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case?"

In addition, the court instructed the jury as to the defendant's testimony as follows: "And in this case, the defendant testified. An accused person, having taken the [witness] stand, stands before you just like any other witness. He is entitled to the same considerations and must have his testimony tested and measured by you by the same factors and standards as you would judge the testimony of any other witness. That necessarily involves a consideration of his interest in the verdict that you will render. You have no right to disregard his testimony or to disbelieve his testimony merely because he is accused of a crime. You will consider my earlier instructions on the general subject matter of creditability that obviously pertain to the defendant's testimony as well as the testimony of any other witness."

Thereafter, the defendant took exception to the court's instructions concerning his credibility, thereby, preserving his claim for appeal.[3] See *Barry* v. *Posi-Seal*

[3] The defendant objected: "Our argument is, and I know that this has been rejected in the past, but we do make the argument that it puts too much of a burden on the defendant testifying. Calls attention to his interest in the case when that has already been called attention to prior in the charge and [credibility] of witnesses, so I'm going to ask that—I'm going to take an exception to the charge on defendant's testimony."

*International, Inc.*, 36 Conn. App. 1, 8, 647 A.2d 1031 (1994), remanded for further consideration, 235 Conn. 901, 664 A.2d 1124 (1995). He now challenges the propriety of the instructions under the federal and state constitutions. We review each in turn.

A

Federal Constitutional Claim

The defendant argues that the court's instructions undermined his federal constitutional rights to the presumption of innocence, to a fair trial and to testify in his defense. He further asserts that the court belabored the obvious by instructing the jury as to his credibility after having already instructed the jury on the credibility of witnesses in general. According to the defendant, this sent the jury the message of "don't trust *this* defendant."[4] (Emphasis added; internal quotation marks omitted.) *United States* v. *Dwyer*, 843 F.2d 60, 63 (1st Cir. 1988). We do not agree.

In reviewing the defendant's claim of instructional error, we apply the same standard of review as set

---

[4] The defendant also argues that the situation was further aggravated for two reasons. First, he asserts that the instructions were exacerbated by the prosecutor's closing argument in which she stated: "Now, when you judge the credibility of the defendant, you can judge his credibility just like everybody else. You judge credibility by who has interest in the outcome of the case." Our courts have held as proper instructions on weighing the credibility of the defendant's testimony and prosecutorial comment concerning the defendant's interest in the outcome. See p. 637 of this opinion; *State* v. *Thompson*, 266 Conn. 440, 466, 832 A.2d 626 (2003) (prosecutor may comment on witness' motivation to be truthful or to lie); *State* v. *Skidd*, 104 Conn. App. 46, 66, 932 A.2d 416 (2007) (same). We thus conclude that this claim is without merit.

Second, the defendant argues that impropriety of the court's instructions as to his interest in the outcome of the trial was reinforced by the instruction concerning consciousness of guilt because, together, they allegedly increased the already substantial risk that the court intimated that his testimony should be specially examined. In support of this claim, the defendant provides no persuasive authority, and we deem it similarly unavailing.

forth in part I of this opinion. Particularly, we consider "whether, when read as a whole, the charge presents the case to the jury in such a way that no injustice will result." *State* v. *Mastropetre*, supra, 175 Conn. 524.

"[T]he fact that the witness is a defendant in a criminal prosecution, or is a participant in the offense or in a related offense, creates an interest which affects his credibility. . . . Where a defendant in a criminal case testifies in his own behalf, his interest in the result is a proper matter to be considered as bearing on his credibility, and it has been considered that his position of itself renders his testimony less credible than if he were a disinterested witness, especially where he has a criminal record. . . . The rule is well settled in this state that the court may advise the jury that in weighing the credibility of an accused's testimony [it] can consider his interest in the outcome of the trial. We have adhered to this rule in many cases." (Citations omitted; internal quotation marks omitted.) *State* v. *Bennett*, 172 Conn. 324, 335, 374 A.2d 247 (1977); accord *State* v. *Guthridge*, 164 Conn. 145, 151, 318 A.2d 87 (1972), cert. denied, 410 U.S. 988, 93 S. Ct. 1519, 36 L. Ed. 2d 186 (1973); *State* v. *Smith*, 65 Conn. App. 126, 144, 782 A.2d 175 (2001), rev'd on other grounds, 262 Conn. 453, 815 A.2d 1216 (2003); see also *State* v. *Mack*, 197 Conn. 629, 636, 500 A.2d 1303 (1985) (rejecting challenge to such instructions as " 'totally without merit' "); *State* v. *Roos*, 188 Conn. 644, 645, 452 A.2d 1163 (1982) (rejecting challenge to such instructions as "utterly without merit"); *State* v. *Colon*, 37 Conn. App. 635, 640, 657 A.2d 247 (noting our courts have rejected the claim that such instructions violate defendant's constitutional right to fair trial and due process), cert. denied, 234 Conn. 911, 660 A.2d 354 (1995). Indeed, "the interest of the defendant in the result of the trial is of a character possessed by no other witness, and is therefore a matter which may seriously affect the credence that shall be given

to his testimony." (Internal quotation marks omitted.) *State* v. *Bennett,* supra, 337, quoting *Reagan* v. *United States,* 157 U.S. 301, 310, 15 S. Ct. 610, 39 L. Ed. 709 (1895).

Connecticut appellate courts repeatedly have held that a court's instruction that the jury evaluate the defendant's testimony in the same manner as that of any other witness after pointing out the defendant's interest in the outcome is neither improper nor transcends the bounds of evenhandedness. *State* v. *Williams,* 220 Conn. 385, 397, 599 A.2d 1053 (1991); *State* v. *Mastropetre,* supra, 175 Conn. 524–25; *State* v. *Smith,* supra, 65 Conn. App. 144. Juries are presumed to follow the court's instructions in the absence of a fair indication to the contrary. *State* v. *Anderson,* 86 Conn. App. 854, 870, 864 A.2d 35, cert. denied, 273 Conn. 924, 871 A.2d 1031 (2005). Upon our review of the court's instructions, we conclude that they were balanced and evenhanded. The court instructed the jury: "An accused person, having taken the [witness] stand, stands before you just like any other witness. He is entitled to the same considerations and must have his testimony tested and measured by you by the same factors and standards as you would judge the testimony of any other witness." Such instructions are in harmony with those that consistently have been held proper by our courts. The defendant's claim fails.

B

State Constitutional Claim

The defendant also claims that the court's instructions concerning his interest in the outcome of the case undermined his state constitutional rights to a fair trial, to testify and to the presumption of innocence. We disagree.

In *State* v. *Geisler,* 222 Conn. 672, 685, 610 A.2d 1225 (1992), our Supreme Court "set forth six factors that,

to the extent applicable, are to be considered in construing the contours of our state constitution so that we may reach reasoned and principled results as to its meaning. These factors are: (1) the text of the operative constitutional provision; (2) holdings and dicta of this court and the Appellate Court; (3) persuasive and relevant federal precedent; (4) persuasive sister state decisions; (5) the history of the operative constitutional provision, including the historical constitutional setting and the debates of the framers; and (6) contemporary economic and sociological considerations, including relevant public policies. . . .

"Although, in *Geisler*, we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . [Moreover], not every *Geisler* factor is relevant in all cases. . . . Accordingly, our analysis of . . . the state constitution is informed by those *Geisler* factors that are relevant to the analysis, which are to some degree intertwined." (Citations omitted; internal quotation marks omitted.) *Honulik* v. *Greenwich*, 293 Conn. 641, 648–49, 980 A.2d 845 (2009).

We begin by noting that the defendant focuses on only four *Geisler* factors, which, he alleges, compel the conclusion that Connecticut's constitution affords greater protection than its federal counterpart with regard to instructions concerning the defendant's interest in the outcome. Because he does not address either the text of the operative constitutional provisions or contemporary economic and sociological considerations, including relevant public policies, our analysis is limited to an examination of Connecticut, sibling state and federal authority, and the history of the operative state constitutional provision.

The defendant relies on the dissents of two Connecticut jurists in his analysis of Connecticut authority. He

first cites Justice Callahan's dissent in *State* v. *Cassidy*, 236 Conn. 112, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), overruled in part by *State* v. *Alexander*, 254 Conn. 290, 296, 755 A.2d 868 (2000), a case in which the court found that the prosecutor's argument to the jury that the defendant was present in court throughout the trial and was able to tailor his testimony, invited the jury to draw an adverse inference that violated his constitutional rights. Justice Callahan stated: "[T]he trial court routinely instructs the jury that the defendant's interest in the outcome of the case may be considered in assessing his credibility. We have, moreover, consistently said that such an instruction was proper, concluding that it did not violate the defendant's right to testify and did not constitute a due process violation. . . . In fact, the instruction, coming as it does from the judge, probably has a greater tendency to induce a jury to view a defendant's testimony with heightened skepticism than a remark such as the prosecutor made . . . ." (Citations omitted.) Id., 153–54. The defendant asserts that Justice Callahan's dissent indicates that the court's instructions in the present case at least caused the jury to view the defendant's testimony with heightened skepticism. We are not persuaded. The defendant overlooks that part of Justice Callahan's dissent in which he plainly expressed that our courts have consistently held as proper jury instructions concerning the defendant's interest in the outcome of the case when evaluating the defendant's credibility. That dissent, we conclude, lends credence to the state's position more so than the defendant's.

The defendant also notes the dissents of Justice Bogdanski in *State* v. *Mastropetre*, supra, 175 Conn. 524, *State* v. *Bennett*, supra, 172 Conn. 324, and *State* v. *Jonas*, 169 Conn. 566, 363 A.2d 1378 (1975), cert. denied, 424 U.S. 923, 96 S. Ct. 1132, 47 L. Ed. 2d 331 (1976), in

which Justice Bogdanski argued that the court's instructions that the jury consider the defendant's outcome in the respective cases in evaluating the defendant's testimony denigrated the weight to be afforded the defendant's testimony and deprived him of the presumption of innocence. The defendant, however, ignores the *majority* opinions of those cases, among others, in which our courts routinely have recognized such instructions as entirely proper; see part II A of this opinion; as well as Justice Callahan's dissent in *Cassidy*, on which he relies.

Our Supreme Court's decision in *State* v. *Higgins*, 201 Conn. 462, 518 A.2d 631 (1986), is also instructive. There, the court considered instructions on the defendant's interest in the trial's outcome under our state constitution. The defendant challenged the instructions as a denigration of the right of an accused under article first, § 8, of our state constitution "to be heard by himself." (Internal quotation marks omitted.) Id., 475. Although the court underscored that "[t]he defendant assumes that this provision establishes a state constitutional right to testify," the court determined that "[s]uch an assumption is doubtful . . . ." Id., 476–77. Nevertheless, in *Higgins*, the court held that even if the defendant's state constitutional right to be heard was viewed as an additional source of the constitutional right to testify, as has been implicitly recognized under the aegis of state and federal due process provisions, "the scope of the right to testify would not necessarily be changed by virtue of its multiple origin. In any event, the nature of that right would not necessarily be so enhanced as to preclude fair comment upon the interest of [the defendant]." Id., 477. In light of the foregoing, we conclude that Connecticut authority weighs in favor of the state.

In examining sibling state authority, it is apparent that there is neither a clear majority nor a growing

minority of states finding improper instructions concerning the defendant's interest in the outcome when evaluating the credibility of his testimony, nor does the defendant claim as much. Rather, the defendant argues that because a series of cases from certain states have found such instructions improper, so, too, should we under our state constitution.[5] See *People* v. *Boren*, 139 Cal. 210, 215, 72 P. 899 (1903); *Alder* v. *State*, 239 Ind. 68, 70–73, 154 N.E.2d 716 (1958); *State* v. *Bester*, 167 N.W.2d 705, 708 (Iowa 1969); *State* v. *DeVries*, 13 Kan. App. 2d 609, 617–19, 780 P.2d 1118 (1989); *State* v. *Carroll*, 134 La. 965, 967–71, 64 So. 868 (1914); *Sumrall* v. *State*, 343 So. 2d 481, 482 (Miss. 1977); *Donner* v. *State*, 72 Neb. 263, 269, 100 N.W. 305 (1904); *Fletcher* v. *State*, 2 Okla. Crim. 300, 322–23, 101 P. 599 (1909), overruled in part on other grounds by *Parker* v. *State*, 917 P.2d 980, 986 n.11 (Okla. Crim. App. 1996), cert. denied, 519 U.S. 1096, 117 S. Ct. 777, 136 L. Ed. 2d 721 (1997); *State* v. *Boise*, 146 Vt. 46, 49, 498 A.2d 495 (1985). At the same time, the defendant ignores a separate series of cases holding to the contrary. See, e.g., *Bell* v. *State*, 284 Ga. 790, 794–95, 671 S.E.2d 815 (2009); *People* v. *Barney*, 176 Ill. 2d 69, 74, 678 N.E.2d 1038 (1997); *State* v. *Barry*, 495 A.2d 825, 827 (Me. 1985); *State* v. *Thompson*, 293 N.C. 713, 719, 239 S.E.2d 465 (1977); *Thompson* v. *State*, 83 Wis. 2d 134, 148, 265 N.W.2d 467 (1978); *People* v. *Seabrooks*, 135 Mich. App. 442, 453, 354 N.W.2d 374 (1984); *Pennsylvania* v. *Frye*, 272 Pa. Super. 200, 205–206, 414 A.2d 1077 (1979); *State* v. *Smith*, 100 N.J. Super. 420, 426, 242 A.2d 49 (1968). It thus is fair to say that sibling authority is a neutral factor in our analysis.

In considering federal precedent, the defendant relies on certain decisions of the United States Courts of

[5] The defendant also supports his position with cases from Australia and Canada, as well as William Shakespeare's Macbeth. We refuse to consider this in our review of sibling state authority.

Appeal for the First and Second Circuits that have expressed disapproval of jury instructions highlighting the defendant's personal interest in the outcome. See *United States* v. *Gaines*, 457 F.3d 238, 248 (2d Cir. 2006); *United States* v. *Dwyer*, supra, 843 F.2d 63; *United States* v. *Rollins*, 784 F.2d 35, 37 (1st Cir. 1986). Despite those decisions, the United States Supreme Court has indicated otherwise. See *Reagan* v. *United States*, supra, 157 U.S. 301 (approving court's instruction that defendant's deep personal interest in outcome should be considered in determining his credibility). The defendant contends that *Reagan* is of little import to our analysis because it addressed this issue in the context of a defendant's right to testify, which at the time was not a constitutional right but a statutory right of then recent vintage. See id., 304. The defendant further notes that, more recently, courts have evaluated challenges to such instructions against the backdrop of the presumption of innocence. See *United States* v. *Gaines*, supra, 245; *United States* v. *Dwyer*, supra, 64 ("[i]t is hardly consistent for the court to charge the jury as to the presumption of innocence and at the same time indicate doubts about defendant's credibility"). Nevertheless, in *Portuondo* v. *Agard*, 529 U.S. 61, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000),[6] the United States Supreme Court reiterated its finding in *Reagan*, decided more than one century prior: "[T]his Court has approved of such generic comment before. In *Reagan* . . . the trial court instructed the jury that [t]he deep personal interest which [the defendant] may have in the result of the suit should be considered . . . in weighing his evidence and in determining how far or to what extent, if at all, it is worthy of credit. . . . [I]t simply set forth a consideration the jury was to have in mind when

---

[6] *Portuondo* considered "whether it was constitutional error for a prosecutor, in her summation, to call the jury's attention to the fact that the defendant has the opportunity to hear all other witnesses and to tailor his testimony accordingly." *Portuondo* v. *Agard*, supra, 529 U.S. 63.

assessing the defendant's credibility . . . . *What Reagan permitted . . . is in a long tradition that continues to the present day.*"[7] (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 70–73; see also *United States* v. *Jones,* 587 F.2d 802, 806 (5th Cir. 1979); *United States* v. *Hill,* 470 F.2d 361, 365 (D.C. Cir. 1972); *State* v. *Bennett,* supra, 172 Conn. 336 (approvingly citing *Reagan* in holding as proper court's instructions that the jury consider defendant's interest in outcome of case when assessing credibility of his testimony). In light of that body of law, we conclude that federal precedent, at best, favors neither party.

Finally, we examine the history of the operative constitutional provision, including the historical constitutional setting and debates of the framers. The defendant provides a historical analysis of a defendant's right to testify in which he argues, inter alia, that "the law guards with anxious solicitude the rights of parties accused of crime." *State* v. *Coffee,* 56 Conn. 399, 415–16, 16 A. 151 (1888). Furthermore, relying principally on *State* v. *Branham,* 171 Conn. 12, 368 A.2d 63 (1976), the defendant contends that if a judge cannot comment on the defendant's decision not to testify but is still able to make special mention of a testifying defendant's interest in the trial's outcome, the nontestifying defendant's

---

[7] In *United States* v. *Gonsalves,* 435 F.3d 64 (1st Cir. 2006), cited by the defendant in his brief, the First Circuit also referenced *Reagan.* It stated: "In the past this court has held that certain instructions in this vein—but more egregiously phrased—amounted to error. . . . The caution is still good law in this circuit but cannot be pressed too far. Indeed, in *Reagan* . . . cited with approval in *Portuondo* . . . the Supreme Court expressly approved an instruction calling attention to the testifying defendant's interest in the outcome.

"In [*Gonsalves*], the reference to the defendant's interest was no different than the instruction given in *Reagan* or standard instructions used elsewhere. . . . It was immediately followed by the warning that [y]ou should not disregard or disbelieve [Gonsalves'] testimony simply because he is charged as a defendant in this case. We think the instruction was not error and decline to extend *Dwyer* beyond its present reach." (Citations omitted; internal quotation marks omitted.) Id., 72.

interest is afforded greater protection. Id., 17. In study-
ing this particular *Geisler* factor, our courts have looked
to the historical period before and during the adoption
of our state constitution. See *Moore* v. *Ganim*, 233
Conn. 557, 602, 660 A.2d 742 (1995) (considering histori-
cal evidence at time of adoption of 1818 constitution);
*State* v. *Linares*, 232 Conn. 345, 384–85, 655 A.2d 737
(1995) (considering concerns and historical underpin-
nings immediately preceding our constitution's enact-
ment); *State* v. *Sulewski*, 98 Conn. App. 762, 775 n.12,
912 A.2d 485 (2006) (same); see also *State* v. *Medina*,
228 Conn. 281, 332, 636 A.2d 351 (1994) (considering
treatise of Chief Justice Zephaniah Swift, leading jurist
of 1818, in historical constitutional setting and debates
of constitution's framers). Significantly, the defendant
presents no evidence as to the historical setting and
debates of our framers at the time of the adoption of
our state constitution but, instead, provides a historical
analysis of a defendant's right to testify, which first
arose in 1867.

In *State* v. *Higgins*, supra, 201 Conn. 462, our
Supreme Court doubted that the "right to be heard by
himself and by counsel" provision of article first, § 8,
of our state constitution established a constitutional
right to testify because "at the time of the adoption of
our state constitution in 1818, a defendant was unable
to testify as a witness in his own case because of his
interest, a disability that was not removed until 1867,
when the common law rule was modified by the statu-
tory predecessor of General Statutes § 54-84." Id., 476–
77. Still, the court found that even if that provision
was regarded as providing an additional source of the
constitutional right to testify under our state constitu-
tion, "the scope of the right to testify would not neces-
sarily be changed by virtue of its multiple origin." Id.,
477. As an intermediate appellate court, we are unable
to reconsider or to overrule the decisions of our

Supreme Court. See *Mazzuca* v. *Sullivan*, 94 Conn. App. 97, 102, 891 A.2d 83 (axiomatic that appellate court is bound by decisions of our Supreme Court), cert. denied, 278 Conn. 905, 896 A.2d 107 (2006); *State* v. *Colon*, 71 Conn. App. 217, 245–46, 800 A.2d 1268 (same), cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002). Although the defendant argues that history aids his position, his historical analysis is based solely on a defendant's right to testify.[8] Because the defendant has not provided historical analyses as to a defendant's presumption of innocence or right to a fair trial, we do not consider such. See *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, 227 Conn. 175, 181 n.4, 629 A.2d 1116 (1993) (refusing to entertain abstract assertions absent any analysis); *State* v. *Adams*, 117 Conn. App. 747, 753, 982 A.2d 187 (2009) (same). The defendant's historical analysis is, therefore, unavailing.

In conclusion, the defendant's *Geisler* analysis has not persuaded us that our state constitution affords greater protection than its federal counterpart as to the defendant's interest in the outcome when assessing the credibility of his testimony. We therefore conclude that his claim under the state constitution must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[8] In his reply brief, the defendant concedes that his historical analysis concerns only the right to testify.